**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

OSCAR MCCULLOUGH,

    *Plaintiff,*

    v.

MATTHEW G. WHITAKER, *Acting*
*Attorney General of the United States,*

    *Defendant.*

Civil Action No. 14-296 (RDM)

## MEMORANDUM OPINION

To borrow from Tolstoy, all happy workplaces are alike, but each unhappy workplace is unhappy in its own way. This case is about one very unhappy workplace. Plaintiff Oscar McCullough claims that from 2009 to 2011, he had an extramarital affair with a coworker at the Department of Justice Office of the Inspector General ("OIG"). When the affair supposedly ended, turmoil began. That coworker, Brandie Miller, and several of McCullough's other colleagues complained to their supervisors that McCullough spread false and malicious rumors about them. McCullough denied these allegations and asserted that it was the other way around: Miller and the others were harassing him. The Department of Justice initiated a formal investigation, which unfolded over four months. The investigation determined that McCullough's complaints against Miller and the others were unfounded but that the complaints against McCullough had merit. The investigation concluded in particular that McCullough had made inappropriate comments of a sexual nature, that he had deliberately hindered coworkers from completing their assignments, and that he had made inappropriate and potentially discriminatory comments about a pregnant job applicant. OIG suspended McCullough for seven

days without pay. According to OIG, the suspension was based on McCullough's misconduct. McCullough sees it differently. He believes that he was suspended based on his sex and also in retaliation for complaining about sex discrimination.

McCullough, accordingly, filed this action under Title VII of the Civil Rights Act of 1964, asserting claims of sex discrimination and retaliation against the Department. Dkt. 3. The matter is now before the Court on the Department's motion for summary judgment, Dkt. 33. For the reasons that follow, the Court will **GRANT** the Department's motion.

## I. BACKGROUND

The following facts are undisputed except where noted.

A. **Factual Background**

1. *Allegations of Misconduct*

From March 2008 to February 2016, Oscar McCullough served as a contracting officer in the Management and Planning ("M&P") Division of the Office of the Inspector General at the Department of Justice. Dkt. 33-2 at 1 (Def.'s SUMF ¶ 1); Dkt. 33-22 at 4 (McCullough Aff. ¶¶ 8–12). His direct supervisor was Michael Barbour, the Director of the Office of Administrative Services, and his second-level supervisor was Linda Ruder, the Deputy Assistant Inspector General. Dkt. 33-22 at 5 (McCullough Aff. ¶¶ 14–19). According to McCullough, he had an extramarital affair with an OIG coworker, Brandie Miller. Dkt. 33-2 at 3 (Def.'s SUMF ¶ 10); Dkt. 33-22 at 17 (McCullough Aff. ¶ 77). After McCullough allegedly ended their romantic relationship in July 2011, their professional relationship soured, and several other employees became embroiled in the ensuing conflict. Dkt. 33-2 at 6 (Def.'s SUMF ¶ 21); Dkt. 33-22 at 17 (McCullough Aff. ¶ 77).

Beginning in August and continuing through November 2011, Miller and other colleagues complained to management about McCullough's behavior. The complaints alleged the following: (1) that McCullough had spread spurious and inappropriate rumors about four colleagues: Miller, Allen Anthony, Jacqueline Wilson-Gooch, and Tiffany Tilghman, *id.* at 2 (Def.'s SUMF ¶ 7); (2) that McCullough had intentionally impeded Miller's and Anthony's ability to carry out their professional responsibilities, *id.* at 3 (Def.'s SUMF ¶ 8); and (3) that McCullough had made inappropriate comments about a pregnant job applicant, *id.* (Def.'s SUMF ¶ 9).

The initial set of complaints was lodged by Miller and Miller's friend, Human Resources Specialist Kimberly Broden, and asserted that McCullough was spreading false rumors about Miller to their colleagues. *See id.* at 3–4 (Def.'s SUMF ¶¶ 11–12). These complaints prompted Cindy Lowell, OIG's Human Resources Director, to raise the rumor issue with McCullough in September 2011. *Id.* at 4 (Def.'s SUMF ¶ 13). McCullough denied spreading the rumors, *id.* (Def.'s SUMF ¶ 13), and asserted that he suspected Miller, Broden, and Financial Management Analyst Tiffany Tilghman of stealing personal items from his office, *id.* at 5 (Def.'s SUMF ¶ 16); Dkt. 33-22 at 17 (McCullough Aff. ¶ 64). Although McCullough was repeatedly advised to report the thefts and to seek an investigation, he declined to do so multiple times. Dkt. 33-2 at 5 (Def.'s SUMF ¶ 17); *see id.* at 6 (Def.'s SUMF ¶¶ 20–21); *id.* at 8 (Def.'s SUMF ¶ 28). Miller, Broden, and Tilghman, for their part, denied having any knowledge of the thefts. *Id.* at 5 (Def.'s SUMF ¶ 17); *id.* at 17 (Def.'s SUMF ¶ 65).

Later in September, McCullough notified Lowell for the first time that he and Miller had engaged in a romantic relationship, that he had ended the affair, and that Miller and Broden were angry with him. *Id.* at 3–4 (Def.'s SUMF ¶ 10). McCullough also forwarded to Lowell an email

from Broden and a voicemail from Miller, both of which expressed anger toward McCullough for his treatment of Miller. *Id.* at 6 (Def.'s SUMF ¶ 22). According to Lowell, McCullough reported that the situation had calmed down and that he did not want her to take any action. *Id.* at 6–7 (Def.'s SUMF ¶ 23).

Meanwhile, the complaints regarding McCullough's behavior continued to mount. Allen Anthony, a new Support Services Specialist at OIG, reported to management that McCullough had started a false rumor about him. *Id.* at 7 (Def.'s SUMF ¶ 24). According to Anthony, McCullough told their colleagues that Anthony and Miller were involved in a sexual relationship. *Id.* (Def.'s SUMF ¶ 24).

Anthony's complaint spurred Lowell to bring up the rumor issue with Ruder and Gregory Peters, the M&P Assistant Inspector General. *Id.* (Def.'s SUMF ¶ 25). Peters and Ruder agreed that management needed to warn the entire office that the rampant rumors were unacceptable. *Id.* (Def.'s SUMF ¶ 25). Accordingly, at an all-hands meeting on October 5, Peters announced a new policy titled "M&P Zero Tolerance Policy on Office Gossip and Rumors," which barred employees from rumor mongering. *Id.* (Def.'s SUMF ¶ 26); *see* Dkt. 33-1 at 7 ("At this point, . . . OIG management issued a 'Zero Tolerance Policy['] . . . ."); Dkt. 33-26 (Zero Tolerance policy). Under that policy, spreading gossip could result in discipline. Dkt. 33-2 at 7–8 (Def.'s SUMF ¶¶ 26–27); Dkt. 38-1 at 4 (Pl.'s SDMF ¶¶ 26–27).

In November, a few weeks after Peters's intervention, Personnel Security Specialist Jackie Wilson-Gooch reported a new rumor to Barbour and Lowell. Dkt. 33-2 at 8 (Def.'s SUMF ¶ 29). According to Wilson-Gooch, she had heard that McCullough falsely told a coworker that he had stayed overnight at Wilson-Gooch's house. *Id.* (Def.'s SUMF ¶ 29). McCullough denied that he was the source of this rumor. Dkt. 38-1 at 5 (Plt.'s SDMF ¶ 29).

In 2011, McCullough told Lowell that he felt he was being harassed. Dkt. 33-2 at 8 (Def.'s SUMF ¶ 31); Dkt. 38-1 at 5 (Pl.'s SDMF ¶ 31). Although McCullough later clarified that he was referring to Tilghman, Lowell believed he was talking about Miller and Broden. Dkt. 33-2 at 8 (Def.'s SUMF ¶ 31 & n.4); Dkt. 33-16 at 8 (OGC Report at 7); Dkt. 33-19 at 7–9. Lowell, accordingly, met with the two women. Dkt. 33-2 at 9 (Def.'s SUMF ¶ 32). They denied having any new conflicts with McCullough or spreading any rumors, and neither one wished to pursue their own complaints further. *Id.* (Def.'s SUMF ¶ 32). McCullough, however, asked Lowell to "pursue an investigation of the alleged harassment and false rumors about him" and of the thefts. Dkt. 33-16 at 8 (OGC Report at 7).

2. *Internal Investigation and Findings*

OIG's Office of General Counsel ("OGC") conducted the investigation, which encompassed "McCullough's complaints" and "several complaints about McCullough's conduct." Dkt. 33-16 at 2 (OGC Report at 1). OGC interviewed nine employees: McCullough, Miller, Broden, Anthony, Wilson-Gooch, Tilghman, Barbour, and Lowell, as well as M&P Student-Office Automation Clerk Cedric Hopkins. *Id.* at 3 (OGC Report at 2). The investigation culminated in a comprehensive 19-page report issued on March 23, 2012 by OIG's General Counsel, William Blier. *See id.* at 2 (OGC Report at 1).

OGC's investigation revealed "a troubling lack of maturity and professionalism" in M&P, "primarily by McCullough, but by other M&P staff members as well." *Id.* at 2 (OGC Report at 1). The report reached three conclusions. OGC concluded, first, that "there was insufficient evidence" that Miller or Broden stole from McCullough or that Miller or her friends had harassed him. *Id.* at 3 (OGC Report at 2). Second, OGC was unable to substantiate the rumor allegations against McCullough:

While there was evidence to support Miller's and Tilghman's allegations that McCullough spread false rumors about Miller engaging in sexual relationships with numerous . . . employees, including McCullough's alleged admissions of such conduct to at least two M&P employees, we could not conclude by a preponderance of evidence that McCullough engaged in this serious misconduct.

*Id.* (OGC Report at 2). OGC, however, finally concluded that McCullough had "disrupted the M&P work environment by initiating inappropriate sexually-oriented discussions in the workplace with several colleagues" and "by refusing to cooperate with colleagues on work assignments." *Id.* (OGC Report at 2). In addition, the investigation revealed that McCullough "repeatedly complained" to coworkers "about the OIG hiring of a pregnant female." *Id.* at 19 (OGC Report at 18).

    3.   *Suspension Decision*

Two months later, on May 23, 2012, Ruder issued an official notice of proposed suspension to McCullough. *See* Dkt. 34-2 (Ruder Memo). Ruder proposed suspending McCullough for seven business days without pay "based on [his] conduct in: (1) initiating inappropriate sexually oriented discussions in the workplace with several colleagues; (2) intentionally obstructing [his] colleagues' work; and (3) making other inappropriate, potentially discriminatory statements in the workplace." *Id.* at 2 (Ruder Memo at 1).

McCullough protested the proposed suspension, *see id.* at 15 (Ruder Memo at 14); Dkt. 34-1 at 2, but on July 25, 2012, Peters formally decided that McCullough would be suspended for a period of seven business days, Dkt. 34-3 at 2 (Peters Memo at 1). Peters based his decision on the three grounds specified in Ruder's notice. *Id.* at 2 (Peters Memo at 1). McCullough served his seven-day suspension between August 22 and August 30, 2012. Dkt. 3 at 7 (Compl. ¶¶ 60, 62).

4. *Administrative EEO Proceedings*

On December 13, 2011, McCullough contacted a Department of Justice EEO counselor. *See* Dkt. 8-9 at 2–3. According to a letter that the EEO office sent, McCullough's original complaint was limited to an allegation that several of his co-workers had "subjected [him] to severe and pervasive harassment" that included "threats of physical violence and intimidating behavior," the "theft of personal items," and "harassing and threatening phone calls, e-mails, and voice mails." *Id.* at 2. In early January 2012, McCullough met with an investigator who was working on the OGC investigation. Dkt. 3 at 5 (Compl. ¶ 42); Dkt. 33-16 at 8 (OGC Report at 7). McCullough "withdrew" from the EEO process shortly thereafter, apparently on the basis of an alleged statement by the investigator that OIG would tell McCullough's colleagues to stop harassing him. Dkt. 3 at 6 (Compl. ¶ 43); Dkt. 8-9 at 3. McCullough approached the EEO counselor again on February 24, 2012, to complain about "severe and pervasive harassment." Dkt. 8-9 at 3. McCullough "amended and supplemented his EEO complaint several times," prompting "four separate EEO investigations," the last of which concluded on April 27, 2014. Dkt. 33-15 at 5 (Fallowfield Decl. ¶¶ 19–21).

**B. Procedural History**

McCullough filed this suit under Title VII of the Civil Rights Act of 1964 on February 24, 2014. Dkt. 3 (Compl.). He originally asserted claims of gender discrimination and retaliation arising out of several actions taken by the Department in 2011 and 2012, including his seven-day suspension. *See* Dkt. 3 at 8–12 (Compl. ¶¶ 70–93). The Department filed a combined motion to dismiss and for summary judgment. Dkt. 8. The Court granted the Department's motion "with respect to all of [McCullough's] claims except" his claim based on his seven-day suspension and his claim based on a "denial of advanced sick leave" in October 2012. Minute

Order (June 16, 2016). At a later hearing, the Court dismissed the latter claim by stipulation of the parties. *See* Minute Entry (June 15, 2017). After a period of discovery, the Department then renewed its motion for summary judgment, Dkt. 33. That motion is now before the Court.

## II. LEGAL STANDARD

The moving party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A fact is "material" if it could affect the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court, moreover, must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party makes this showing, the burden then shifts to the nonmoving party to demonstrate that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials and, instead, must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. That is, once the moving party carries its initial burden on summary judgment, the

nonmoving party must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

### III. ANALYSIS

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees based on their sex, 42 U.S.C. § 2000e-2(a)(1), and from retaliating against employees who complain of employment discrimination, 42 U.S.C. § 2000e-3(a). McCullough alleges that the Department did both of those things when it suspended him for seven business days. To prevail on a claim of sex discrimination, a plaintiff must show that this decision was taken "because of [his] . . . sex." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). To prevail on a retaliation claim, the plaintiff must demonstrate that he or she suffered an adverse action after "having 'made a charge, testified, assisted, or participated in any manner' in a Title VII 'investigation, proceeding, or hearing.'" *Hernandez v. Pritzker*, 741 F.3d 129, 133 (D.C. Cir. 2013) (quoting 42 U.S.C. § 2000e-3(a)). Absent direct evidence of either, a plaintiff may prove a retaliation claim or a discrimination claim with circumstantial evidence under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973); *see also Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1099 (D.C. Cir. 2017) (retaliation claim); *DeJesus v. WP Co. LLC*, 841 F.3d 527, 532 (D.C. Cir. 2016) (disparate treatment claim). "Under this formula, an employee must first make out a prima facie case of retaliation or discrimination." *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (citations omitted). "The employer must then come forward with a legitimate, nondiscriminatory or non-retaliatory reason for the challenged action." *Id.*

Once the employer offers a legitimate, nondiscriminatory reason for the challenged act, however, the Court "need not—and *should not*—decide whether the plaintiff actually made out a prima facie case." *Brady*, 520 F.3d at 494. Instead, the Court should decide only two questions: "Has the employee produced sufficient evidence for a reasonable jury to find [1] that the employer's asserted . . . reason was not the actual reason and [2] that the employer intentionally discriminated against the employee on the basis of" the protected characteristic or the protected activity? *Id.* (citation omitted). In conducting this inquiry, the Court must assess "whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation . . . ; and (3) any further evidence of discrimination" or retaliation. *Nurriddin v. Bolden*, 818 F.3d 751, 759 (D.C. Cir. 2016) (quoting *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012)).

## A.    The Department's Proffered Nondiscriminatory Explanation

The Department contends that McCullough was suspended because, as the OGC investigation concluded, he "made a number of inappropriate, offensive, and sexually explicit comments," "purposefully obstructed his colleagues' work in retaliation for complaints that they had made," and made inappropriate comments about a pregnant job applicant. Dkt. 33-1 at 6; *see id.* at 14. The Department documented the factual basis for each finding in its May 23, 2012 notice of proposed suspension. *See* Dkt. 34-2 (Ruder Memo).

*First*, according to Ruder, McCullough "initiated inappropriate sexually-oriented discussions in the workplace with several colleagues." *Id.* at 10 (Ruder Memo at 9). In these conversations, McCullough allegedly (1) described his "many extramarital affairs, both past and present;" (2) recounted his "sexual relationship and marital problems with [his] wife," (3) attempted to coax others into "provid[ing] reciprocal details about [their] sexual relationship[s];"

(4) persisted in initiating such conversations even after colleagues asked him to stop; (5) engaged in "inappropriate sexual banter"; and (6) described specific female coworkers as "easy." *Id.* at 9–10 (Ruder Memo at 8–9). When asked about the allegations, McCullough purportedly "declined to acknowledge or deny" any specific statements and, instead, "asked what would be inappropriate about such conversations . . . between 'two grown adults.'" *Id.* at 10 (Ruder Memo at 9). Ruder explained that she was "concerned" that McCullough "obviously lack[ed] . . . sensitivity" about what conversations were appropriate—or not—in the workplace. *Id.* at 10–11 (Ruder Memo at 9–10).

*Second*, Ruder explained that McCullough had interfered with Miller's and Anthony's ability to complete projects due to personal disputes:

> When Miller needed your assistance in purchasing items for the "Kid's Day" 2011 event, she sent . . . message[s] to you asking you to meet with her regarding the assignment. You did not respond to Miller's messages, and at one point informed her that you were "busy" with other matters . . . . Miller [then] asked fellow Human Resources Specialist Kate Doss to contact you to complete the "Kid's Day" task. When Miller subsequently . . . ask[ed] for your assistance, you responded that you had already handled the "Kid's Day" issue with Doss, and would not meet with Miller to discuss the matter. Following repeated requests from Doss, you eventually performed the required work. When asked about this, you did not dispute that you did not respond to Miller.

*Id.* at 12 (Ruder Memo at 11).

McCullough's alleged "obstruction of Anthony's work was more pervasive." *Id.* (Ruder Memo at 11). After Anthony learned that McCullough had told others that Anthony and Miller had a sexual relationship, Anthony purportedly confronted McCullough. *Id.* at 12–13 (Ruder Memo at 11–12); *see* Dkt. 33-22 at 17–18 (McCullough Aff. ¶ 77) (acknowledging that Anthony and McCullough spoke about the rumors Anthony had heard). According to Ruder, McCullough then "began to 'punish' Anthony" by delaying approval of documents that "required further processing." Dkt. 34-2 at 13 (Ruder Memo at 12). These forms were time-sensitive and, if not

submitted in a timely fashion, could have resulted in OIG paying "bills for services it [was] no longer using" or additional fees. *Id.* at 12 (Ruder Memo at 11). In addition, Anthony alleged that McCullough "failed to discuss work issues with him." *Id.* at 13 (Ruder Memo at 12). When asked about this assertion, McCullough allegedly stated that he "did not have time" to answer Anthony's questions. *Id.* (Ruder Memo at 12). Ruder further concluded that, even after Barbour met with both Anthony and McCullough, the latter "continued to be uncooperative." *Id.* (Ruder Memo at 12). As a result, "some final bills on contracts were not paid on time." *Id.* (Ruder Memo at 12). In closing, Ruder noted that their relationship had "continued to deteriorate" and that McCullough had "maintained a consistently negative demeanor toward Anthony." *Id.* (Ruder Memo at 12).

*Finally*, according to Ruder, McCullough "repeatedly complained" about OIG hiring a pregnant woman. *Id.* (Ruder Memo at 12). McCullough allegedly stated that the new hire would not be able to complete her work and that her colleagues "would end up having to do her work for her." *Id.* (Ruder Memo at 12).

Ruder concluded that McCullough had "disrupt[ed]" the workplace, wasted his and others' time with "inappropriate conversations," "created an uncomfortable work environment," and "impeded" Miller's and Anthony's "ability to perform their duties." *Id.* (Ruder Memo at 12). She proposed that he be suspended for seven business days. *Id.* at 14 (Ruder Memo at 13).

The formal notice of suspension, issued by Peters on July 25, 2012, reiterated the bases for McCullough's suspension. *See* Dkt. 34-3 (Peters Memo). After reviewing the OGC Report, Ruder's proposal, McCullough's written response to the proposal, and other evidence, Peters "fully adopt[ed]" the description of McCullough's conduct and disciplinary recommendation set forth in the notice of proposed suspension. *Id.* at 4 (Peters Memo at 3); *see id.* at 3 (Peters Memo

at 2). Peters also provided a detailed explanation of why, in his view, the seven-day suspension was both appropriate and necessary:

> First, . . . your conduct negatively impacted the productivity of several of your colleagues. Second, you serve in a highly graded position and clearly should have exhibited more maturity and better judgment in your interactions with colleagues. Third, while you have no past disciplinary record with the OIG, I note that you have a relatively short work history with this organization, and through this investigation of this matter we have learned that you lack positive working relationships with a number of your M&P colleagues. Fourth, your inappropriate conduct, and your failure to recognize and acknowledge the seriousness of this conduct[,] clearly impacts my confidence in your ability to perform your assigned duties. Fifth, after reviewing similar disciplinary cases within the OIG, I find that the proposed 7-day suspension is not excessive in any respect. . . . Finally, despite your claim to the contrary, OIG clearly put you on notice that your misconduct violated OIG rules and regulations.

*Id.* at 8 (Peters Memo at 7). Peters concluded that the suspension was "necessary to impress upon [McCullough] the seriousness of [his] inappropriate conduct and to deter [him] from similar offenses in the future." *Id.* (Peters Memo at 7). He also noted that "each of the three areas of misconduct" above "independently support[ed]" the suspension. *Id.* (Peters Memo at 7).

As the Department's notice of proposed suspension and formal notice of suspension reflect, the Department has offered legitimate, nondiscriminatory reasons for suspending McCullough. The Court, accordingly, must determine whether McCullough has offered sufficient evidence for a reasonable jury to find (1) that those reasons were pretextual and (2) that he was suspended because of his sex or in retaliation for protected activity. *See Brady*, 520 F.3d at 494. In doing so, the Court will consider the evidence with respect to any discriminatory motive that might have influenced Ruder's recommendation or Peters's decision. Under the "cat's paw" theory of liability, an employer can be liable "when a direct supervisor harbors discriminatory animus and influences the ultimate decision maker, even if that decision maker lacks any discriminatory animus." *Noisette v. Lew*, 211 F. Supp. 3d 73, 94 (D.D.C. 2016); *see*

13

*also Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011); *Griffin v. Wash. Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998). Although Peters issued the formal notice of suspension, Ruder drafted the proposed notice of suspension that formed the basis for Peters's decision, and so the Court will consider whether McCullough has identified evidence that would permit a reasonable jury to find that either harbored a discriminatory motive that may have influenced the ultimate suspension.[1]

## B.    Circumstantial Evidence of Discrimination or Retaliation

On summary judgment, the "relevant factual issue" is not whether the incidents described by Ruder and Peters actually occurred; rather, the question is whether they "*honestly and reasonably believed*" that the incidents occurred. *Brady*, 520 F.3d at 496; *see also Johnson*, 849

---

[1] It is theoretically possible, of course, that while free of any discriminatory animus themselves, supervisors may take adverse employment actions based on the discriminatory animus of a party's *co-workers*. In *Staub v. Proctor Hospital*, the Supreme Court "express[ed] no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision." 562 U.S. at 422 n.4. While two Courts of Appeals have extended "cat's paw" liability to the negligent acts of employers that give effect to the animus of low-level employees, *see Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 273–74 (2d Cir. 2016); *Velazquez-Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 274 (1st Cir. 2014), the D.C. Circuit has not yet weighed in on the question.

Because McCullough does not invoke this theory of liability, the Court need not go down this path. Moreover, even if the Court were to consider this type of "cat's paw" liability for actions taken based on the discriminatory motives of co-workers, McCullough would have to offer evidence of three things to avoid summary judgment: (1) that his co-workers made statements to Peters and Ruder about McCullough "for discriminatory reasons and with the intent to cause" his suspension; (2) that his co-workers' "discriminatory acts proximately cause[d]" his suspension; and (3) the Department "act[ed] negligently by allowing the co-workers['] acts to achieve their desired effect though it [knew] (or reasonably should [have known]) of the discriminatory motivation." *Velazquez-Perez*, 753 F.3d at 274; *accord Vasquez*, 835 F.3d at 274. McCullough has not argued that any of these factors are satisfied here, let alone offered evidence to enable a reasonable jury to rule in his favor on them.

F.3d at 1100 n.2 ("Even if Johnson had produced sufficient evidence to dispute whether the infractions occurred, Johnson did not provide sufficient evidence to call into question whether hotel management 'honestly and reasonably believed' that the infractions occurred." (citing *Brady*, 520 F.3d at 496)); *Morris v. McCarthy*, 825 F.3d 658, 671 (D.C. Cir. 2016) (Plaintiff "must raise a genuine dispute over the employer's honest belief in its proffered explanation."); *accord DeJesus*, 841 F.3d at 533; *Hairston v. Vance-Cooks*, 773 F.3d 266, 273 (D.C. Cir. 2014); *Hampton v. Vilsack*, 685 F.3d 1096, 1101 n.8 (D.C. Cir. 2012); *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1248 (D.C. Cir. 2011). Thus, "an employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false." *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005). As long as the Department's "stated belief about the underlying facts" is "reasonable in light of the evidence," there "ordinarily is no basis for permitting a jury to conclude that the employer is lying about" those facts. *Brady*, 520 F.3d at 495. Accordingly, McCullough's blanket denials that the conduct described in the suspension notices ever occurred, *see* Dkt. 38-2 at 11–12, standing alone, would not provide a basis for a reasonable jury to find that McCullough was subjected to an adverse employment action because of his sex or in retaliation for any protected activity. OIG management had to decide who to believe; the fact that they did not credit all of McCullough's denials—in the face of conflicting statements offered by numerous other employees—would not alone support a finding of discriminatory intent, even if McCullough's version of events was, in fact, accurate. *See Dave v. Dist. of Columbia Metro. Police Dep't*, 905 F. Supp. 2d 1, 16 (D.D.C. 2012).

McCullough also contends that a reasonable jury could infer both pretext and discriminatory motive for two reasons: First, he asserts, the decisionmaking process leading to his suspension suffered from procedural defects. *See* Dkt. 38-2 at 16–18. Second, according to McCullough, three coworkers—Miller, Broden, and Tilghman—made inappropriate comments but were never punished.[2] *See id.* at 18–20. Evidence that an employer failed "to follow established procedures or criteria" or treated similarly situated female employees differently may, in some circumstances, suffice to meet a plaintiff's burden of showing a genuine dispute regarding pretext and discrimination. *Brady*, 520 F.3d at 495 n.3. For the reasons explained below, however, McCullough has failed to offer evidence sufficient to show that the Department's explanations for his suspension were pretextual. *Id.* at 496.

1.    *Alleged Procedural Defects*

McCullough contends that the suspension decision was based on the testimony of witnesses who lacked credibility and was the product of an incomplete investigation. A plaintiff can meet his burden of showing pretext by demonstrating that his employer's "investigation . . . [was] so unsystematic and incomplete that a factfinder could conclude that the employer sought, not to discover the truth, but to cover up its own discrimination." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015). McCullough does not suggest that this was the case here, nor could he: the Department's investigation was extensive and its conclusions were reasoned and thoroughly explicated.

---

[2] In his opposition to summary judgment, McCullough also asserts that the Department retaliated against him for pursuing the EEO grievance process by denying him advanced sick leave. *See* Dkt. 38-2 at 20–21. All causes of action based on the denial of his advanced sick leave, however, were dismissed based on the parties' stipulation. *See* Minute Entry (June 15, 2017); *see also* Dkt. 30 at 5 (Hearing Tr. 5:4–15) (identifying paragraphs "68, 71H and 83C" of the complaint as the claims to be dropped).

Short of a grossly defective investigation, an employer's "failure to follow established procedures or criteria" may provide *some* evidence of pretext. *Brady*, 520 F.3d at 495 n.3; *see also Farris v. Clinton*, 602 F. Supp. 2d 74, 87 (D.D.C. 2009) (noting that "[a] defendant's failure to follow established criteria or procedures can cast doubt on its asserted . . . reason" for the employment decision). Standing alone, however, such "procedural irregularities" are not sufficient to *establish* pretext. *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996); *see also Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982). Instead, the procedural defect must be accompanied by "some actual evidence that [the] defendant acted on a motivation to discriminate." *Kelly v. LaHood*, 840 F. Supp. 2d 293, 302 (D.D.C. 2012) (quoting *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 312 (D.D.C. 2005)). To evidence "the employer's discriminatory bias," *Johnson v. Dist. of Columbia*, 99 F. Supp. 3d 100, 106 (D.D.C. 2015), the defect must bear some "connection to the discrimination that the plaintiff is claiming," *Washington v. Chao*, 577 F. Supp. 2d 27, 46 (D.D.C. 2008).

*First*, McCullough attacks Peters's conclusion that McCullough started inappropriate conversations of a sexual nature, which was based on the statements of Broden, Tilghman, and Anthony. According to McCullough, Anthony had "previously made false accusations" about McCullough by reporting to Barbour that McCullough had started a rumor that Anthony and Miller were having an affair. Dkt. 38-2 at 11; *see* Dkt. 33-22 at 17 (McCullough Aff. ¶ 77). To be sure, the OGC report did conclude that there was insufficient evidence that McCullough had started the rumor. That conclusion, however, is a far cry from a finding that Anthony had dissembled or was otherwise untrustworthy. To the contrary, the Department evidently credited his assertions regarding the inappropriate conversations, along with the testimony of other witnesses. Both Ruder and Peters found that Anthony was a credible witness because, as a new

17

employee, he had no prior relationship with McCullough or Miller and had every incentive to get along with his new colleagues. *See* Dkt. 34-2 at 12 (Ruder Memo at 11) (Anthony "merely wanted to make a good impression" and "had every motivation to get along with" McCullough); Dkt. 34-3 at 5 (Peters Memo at 4) (Anthony was "particularly believable" because he described events that "occurred within a short period of his becoming an OIG employee, and by all accounts, he has never been associated with either of" the two other witnesses). To defeat summary judgment, McCullough needs to do more than disagree with the Department's conclusions.

The accusations made by the other witnesses, McCullough contends, "could [not] be substantiated." Dkt. 38-2 at 16. But, again, he offers no support for this contention, other than his assertion that the sexually inappropriate conversations never occurred. An employer, moreover, need not "substantiate" statements from witnesses obtained during the course of an investigation. As the D.C. Circuit has explained, employers must "resolve factual disagreements all the time" to make personnel decisions. *Brady*, 520 F.3d at 496. In doing so, they must conduct "credibility assessments" of various witnesses. *Id.*

This is precisely what the Department did here. Broden asserted that McCullough made comments about his "sex life with [his] wife," "past and present extramarital sexual affairs," "other women to whom [he was] attracted," and "places where [he] had [had] sex." Dkt. 34-2 at 11 (Ruder Memo at 10). Tilghman, for her part, reported that McCullough described his "many extramarital affairs, both past and present" and his "sexual relationship and marital problems with [his] wife, including explicit details of [his] sexual frustrations." *Id.* at 10–11 (Ruder Memo at 9–10). The deciding officials found these accounts credible. Ruder cited "the level of detail and the[ir] consistency." *Id.* at 12 (Ruder Memo at 11). Peters agreed, noting that the statements

"were consistent" and that "there was no indication that the witnesses colluded." Dkt. 34-3 at 5 (Peters Memo at 4). McCullough has not offered *any* evidence to show that the Department did not honestly and reasonably believe the first reason it offered for his suspension. *See George*, 407 F.3d at 415–16.

*Second*, McCullough disputes the basis for the Department's finding that he obstructed his colleagues' work. According to McCullough, he "provided the necessary information to Miller to allow her to make purchases for the Kid's Day event." Dkt. 38-2 at 16–17. This assertion, once again, amounts to a denial that the underlying incident occurred and is not sufficient—standing alone—to demonstrate pretext. McCullough further argues that "Miller completely lacks . . . credibility" because, in his view, she falsely denied that she had a romantic relationship with him. *Id.* at 17. As explained above, however, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Vatel*, 627 F.3d at 1247 (citation omitted). Here, even if Ruder and Peters had reason to doubt Miller's denial that she and McCullough had had an affair—and the Court expresses no view on that question—the could reasonably have concluded that her denial of an embarrassing and deeply personal matter did not undermine her credibility regarding the conduct of the business of the office. The relevant question, again, is whether McCullough has offered evidence that would permit a reasonable jury to find that Ruder or Peters did not "honestly and reasonably believe" this misconduct occurred. *Brady*, 520 F.3d at 496. He has not done so.

McCullough also asserts that Peters "failed to provide any documentation that Plaintiff did not work with [Anthony] or that Anthony's work was affected in some way." Dkt. 38-2 at 17. Unless some policy provides otherwise, employers generally have a good deal of flexibility in fashioning an investigation when complaints are filed. *See, e.g., Craig v. Mnuchin*, 278 F.

Supp. 3d 42, 71–72 (D.D.C. 2017) (explaining that the employer "violated the policies applicable" to the employment decision in question); *Dave*, 905 F. Supp. 2d at 16 ("The fact that the investigation was short does not impugn its reasonableness."). After a thorough investigation, both Ruder and Peters found Anthony's statement credible. McCullough, moreover, has not identified any rule requiring the Department to provide documentation to substantiate a witness's account. Thus, the Court cannot discern any procedural defect with respect to the second justification for McCullough's suspension, let alone one that "give[s] rise to an inference of discrimination." *Kilby-Robb v. DeVos*, 246 F. Supp. 3d 182, 199 (D.D.C. 2017).

*Finally*, McCullough claims that he "never made" the comments about a female job applicant. Dkt. 38-2 at 17–18. Once again, whether or not McCullough in fact acted as described in the notice of suspension is not the relevant question for present purposes. To overcome the Department's motion, McCullough must provide some basis for a reasonable jury to find that Ruder's or Peters's asserted belief that he made the comments was pretextual. *See Brady*, 520 F.3d at 496. McCullough has not done so. And without such evidence, "the Court has no role . . . in resolving whether [he] actually committed the misconduct for which he was punished and reprimanded—no matter how wrong [the Department] may have been." *Dudley v. Wash. Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 169 (D.D.C. 2013).

The Department conducted a comprehensive internal investigation into the workplace strife at the center of this action and found that McCullough had engaged in misconduct.[3] Its

---

[3] McCullough's opposition states that OGC failed to interview "several important witnesses" but does not elaborate further. Dkt. 38-2 at 10 n.13. According to the Department, McCullough had previously claimed that LaSean Lucher, a "key witness," was not interviewed. Dkt. 33-1 at 13. But the Department further asserts that McCullough "never even mentioned Lucher prior to the suspension or asked OGC to interview her." *Id.* at 14. McCullough does not dispute this. Even

findings were supported by the statements of multiple individuals. Dkt. 34-2 at 10–13 (Ruder Memo at 9–12); 34-3 at 7 (Peters Memo at 6); *see also* Dkt. 33-10 at 2–8 (Broden Interview at 1–7); Dkt. 33-11 at 2–5 (Miller Interview at 1–4); Dkt. 33-12 at 2–4 (Tilghman Interview at 1–3); Dkt. 33-13 at 2–8 (Anthony Interview at 1–7). Ruder recommended a relatively modest punishment—a seven-day suspension—to deter him from repeating his actions. Dkt. 34-2 at 14 (Ruder Memo at 13). Peters conducted his own review of the underlying evidence and agreed with Ruder that the suspension was necessary and appropriate. Dkt. 34-3 at 8 (Peters Memo at 7). He also set forth in painstaking detail why he believed the punishment was justified. *Id.* McCullough, in contrast, has failed to provide any evidence indicating that the Department's "stated belief about the underlying facts" was unreasonable. *Brady*, 520 F.3d at 495.

## 2. *Alleged Treatment of Comparators*

McCullough also argues that the Department's more favorable treatment of similarly situated female colleagues provides circumstantial evidence of pretext and sex discrimination. According to McCullough, these colleagues—Miller, Broden, and Tilghman—made inappropriate, sexually-oriented comments but, unlike him, they were not punished.[4] A plaintiff

---

assuming that this issue is properly before the Court—which it is not, given McCullough's failure to provide any detail—the Department's explanation for why Lucher was not interviewed precludes any reasonable inference of pretext. *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 293 (D.C. Cir. 2015) (finding lack of pretext because the decisionmaker was unaware of plaintiff's race when the decision to fire him was made).

[4]


can establish a genuine issue as to pretext by "produc[ing] evidence suggesting that the employer treated other employees of a different" sex "more favorably in the same factual circumstances." *Brady*, 520 F.3d at 495. The plaintiff must first show, however, that these other employees are appropriate comparators. Here, McCullough would need to show that his female colleagues "were charged with offenses of comparable seriousness" and that "all of the relevant aspects of [his] employment situation were nearly identical to those of the [others]." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115–16 (D.C. Cir. 2016) (quoting *Burley*, 801 F.3d at 301); *see also Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999). Factors relevant to this inquiry include "the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley*, 801 F.3d at 301. "Whether two employees are similarly situated ordinarily presents a question of fact for the jury," *Leavitt*, 407 F.3d at 414–15 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)), but "not inevitably so," *Coats v. DeVos*, 232 F. Supp. 3d 81, 93 (D.D.C. 2017). To avoid summary judgment, the plaintiff "must identify *some* evidence from which a reasonable jury could find that the offense he committed was of similar seriousness to that committed by the more favorably treated comparator." *Thompson v. Sessions*, 278 F. Supp. 3d 227, 242 (D.D.C. 2017). McCullough has failed to meet this burden.

*First*, McCullough asserts, Broden sent "multiple inappropriate sexually-oriented emails." Dkt. 38-2 at 18. He cites three emails. The first two relay off-color jokes, Dkt. 10-28 at 2; *id.* at 3; and the third is a chain letter that purports to "e-moon" the recipient, Dkt. 10-28 at 4–9. The Department agrees that these emails "are inappropriate for the workplace" but further contends that that "is beside the point" because Broden's conduct was not similar to

22

conversations McCullough allegedly initiated. Dkt. 39 at 18. The Court agrees. First, the emails were sent two years before the events at issue here and did not prompt a complaint. Second, Broden's emails were relatively impersonal; they did not describe any aspect of her personal life or ask that others share details about their personal lives. The Department, in contrast, found that McCullough described his own sexual past and commented on the sexual histories of his coworkers, Dkt. 34-2 at 11 (Ruder Memo at 10), and that he asked various individuals "to provide reciprocal details about [their] sexual relationship[s]" and requested advice on "how to extricate [him]self from" his affairs and on how to avoid "acting on sexual urges outside of . . . marriage," *id.* (Ruder Memo at 10). There is no evidence, moreover, that Broden's emails prompted complaints or that she persisted in sending off-color emails despite requests from others that she refrain from doing so. The Department, in contrast, found that McCullough "persisted" in making inappropriate comments even after a colleague asked him to stop. *Id.* at 12 (Ruder Memo at 11). Whether an individual's behavior prompts complaints provides one measure of the relative seriousness of their offenses. *See Thompson*, 278 F. Supp. 3d at 243–44. Finally, when OGC asked McCullough about these conversations, he "declined to acknowledge or deny any specific conduct or statements" and instead inquired about why such conversations were inappropriate "between 'two grown adults.'" Dkt. 34-2 at 11–12 (Ruder Memo at 10–11). Ruder found this "obvious lack of sensitivity" troubling, *id.*, and concluded that some punishment was necessary to "deter . . . similar offenses," *id.* at 14 (Ruder Memo at 13). *See Thompson*, 278 F. Supp. 3d at 244 (differentiating putative comparator on the basis that "there was [no] reason to believe, as was the case with [the plaintiff], that [the comparator] was unwilling to change"). Broden's emails are not "offenses of comparable seriousness" to the

misconduct attributed to McCullough and, as a result, Broden is not an appropriate comparator.[5] *Burley*, 801 F.3d at 301.

  *Second*, according to McCullough, Miller, Broden, and Tilghman obstructed his work by blocking his path to the bathroom and to the exit of their workplace. Dkt. 38-2 at 19. The Department responds that this is not an accurate characterization of McCullough's own allegations. *See* Dkt. 39 at 16–17. To substantiate his argument, McCullough cites an undated letter that he purportedly sent to the Equal Opportunity Commission. *See* Dkt. 10-11 at 1. The letter states that on March 20, 2012, while McCullough was "going to the bathroom," he encountered Miller, Broden, and Tilghman in the hallway. *Id.* at 2. They were standing "in such a way that [McCullough had] to pass through in close proximity [to] the group." *Id.* The letter also asserts that "[o]n several occasions" when McCullough was "returning from the gym," Miller and Broden stood in front of the building, "star[ed] at [him] as [he] entered," and followed him into the building. *Id.*

  Regardless of how one characterizes these occurrences, they do not establish pretext or discrimination for two reasons. First, the offenses were not equivalent to the offenses that led to his suspension. "[T]o be considered similarly situated, it is not necessary that the comparators

---

[5] Although McCullough did not raise this in his opposition, McCullough reported to OIG management that Tilghman and another employee "called [him] into one of their offices to ask for [his] opinion on who had 'the biggest a\*\*.'" Dkt. 34-2 at 12 (Ruder Memo at 11). Even if true, this one-off event is not equivalent to McCullough's frequent and persistent sexually explicit comments. *See Thompson*, 278 F. Supp. 3d at 244 ("[T]here is no evidence that [the purported comparator's] profane statements were part of a continuing pattern of abuse . . . ." (internal quotation marks omitted)). More importantly, however, these "other employees denied initiating or reciprocating" the inappropriate behavior. Dkt. 34-2 at 12 (Ruder Memo at 11). In contrast, the Department was "concerned" that McCullough purportedly "declined to acknowledge or deny" any specific statements he was confronted with, and "asked what would be inappropriate about such conversations, if they did occur, between 'two grown adults.'" *Id.* at 11 (Ruder Memo at 10). No reasonable jury could conclude that these facts give rise to an inference of pretext or discrimination.

engaged in the exact same offense." *Wheeler*, 812 F.3d at 1118. The offenses need only be "of 'comparable seriousness.'" *Id.* However, no reasonable jury could find Miller, Broden, and Tilghman's behavior to be comparable to McCullough's. Their actions did not stop him from completing his work assignments—"star[ing]" at McCullough or requiring him to "pass through in close proximity," Dkt. 10-11 at 2, may have been inappropriate if true, but neither kept him from completing his work. In contrast, McCullough—according to the Department—held up several assignments for a significant period by refusing to cooperate with certain individuals.

Second, even assuming that the actions of McCullough and of his colleagues were of a comparable level of seriousness, McCullough's argument runs headlong into another problem: according to the Department, McCullough "never complained to management prior to [his] suspension that his colleagues were obstructing his work." Dkt. 39 at 17. McCullough's written reply to the notice of proposed suspension, which outlined his objections to the OGC Report, did not mention that other colleagues had physically obstructed his ability to move freely. *Id.*; *see* Dkt. 34-1 at 7. McCullough, moreover, has not offered any evidence showing that Ruder or Peters knew of these incidents when they decided to suspend him. Because McCullough bears the burden of showing that the employer's proffered explanation was pretextual, *Brady*, 520 F.3d at 494, this omission is fatal to McCullough's claim that Miller, Broden, and Tilghman are appropriate comparators. An employer's failure to discipline another employee cannot provide evidence of pretext if the employer was unaware of the other employee's misconduct.

To defeat summary judgment, McCullough needed to produce "sufficient evidence for a reasonable jury to conclude that the [Department's] asserted nondiscriminatory reason" for his suspension "was not the actual reason, and that instead the [Department] was intentionally discriminating against [him] on account of" his sex. *Wheeler*, 812 F.3d at 1114. He has not

done so. Accordingly, no reasonable jury could infer that the three justifications in the suspension notices were pretextual and that the Department actually discriminated against him based on his sex.

## CONCLUSION

For the reasons described above, the Court will **GRANT** the Department's motion for summary judgment, Dkt. 33.

A separate Order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: January 8, 2019